IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| R. WAYNE KLEIN, as Receiver,<br><br>                                    Plaintiff,<br><br>   v.<br><br>MICHELLE TUPRIN & ASSOCIATES, P.C., a dissolved Utah professional corporation, and MICHELLE TURPIN, P.C., a Utah professional corporation,<br><br>                                  Defendants. | **MEMORANDUM DECISION AND ORDER**<br><br><br>Case No. 2:14-cv-00302-RJS-PMW<br><br>Judge Robert J. Shelby<br><br>Magistrate Judge Paul M. Warner |

The Receiver for a single-member LLC that was operated as a Ponzi scheme seeks in this case to recover payments the LLC made to Defendants Michelle Turpin & Associates and Michelle Turpin, P.C. (collectively, the Turpin Firm) for legal tax services.[1] The present dispute focuses on who received the reasonable equivalent value of the Turpin Firm's services under the Utah Fraudulent Transfers Act (UFTA).

Plaintiff Wayne Klein was appointed Receiver for National Note of Utah, LLC (NNU) after the Securities and Exchange Commission filed a lawsuit alleging that NNU was operated as a Ponzi scheme. The Receiver later filed this action against the Turpin Firm alleging that fees NNU paid for legal tax services are recoverable under several theories, including fraudulent transfer, constructive trust, and unjust enrichment.

_____

[1] This case initially included Michelle Turpin as a defendant. Plaintiff voluntarily dismissed Michelle Turpin from the suit without prejudice. Dkt. 18 at 2.

The Turpin Firm moves for summary judgment arguing that all of the Receiver's claims should be dismissed.[2]  The Receiver moves for partial summary judgment on his First, Second, and Third Claims for Relief, requesting recovery of $78,135.37.[3]  He has stipulated to the dismissal of his Fourth, Fifth, and Sixth Claims for Relief.

After careful consideration and for the reasons stated below, the court dismisses with prejudice Plaintiff's Fourth, Fifth, and Sixth Claims for Relief, grants in part and denies in part Defendants' Motion for Summary Judgment, and grants Plaintiff's Motion for Partial Summary Judgment.

## BACKGROUND

In 2012, the SEC brought an enforcement action against NNU and its owner Wayne LaMar Palmer, claiming that Mr. Palmer operated NNU as a Ponzi scheme.[4]  The court in the enforcement action appointed Wayne Klein to serve as receiver for NNU and Mr. Palmer's assets.[5]  The Receiver was charged with, among other things, preserving the receivership property.  He was authorized to bring legal actions for this purpose.[6]  The Receiver filed this action to recover payments totaling $88,135.37 that NNU made to the Turpin Firm between 2008 and 2012.[7]

## I.      NNU Operated as a Ponzi Scheme

In his Motion for Summary Judgment, the Receiver sets forth facts establishing that Mr. Palmer operated NNU as a Ponzi scheme during the period that it made these payments to

---

[2] Dkt. 30.

[3] Dkt. 32.

[4] *SEC v. National Note of Utah, LLC*, 2:12-cv-000591-BSJ (D. Utah), Dkt. 1.

[5] *SEC v. National Note of Utah, LLC*, 2:12-cv-000591-BSJ (D. Utah), Dkt. 9; *see* Dkt. 32 at 4.

[6] *SEC v. National Note of Utah, LLC*, 2:12-cv-000591-BSJ (D. Utah), Dkt. 9 at 4–5.

[7] Dkt. 2 at 4.

the Turpin Firm.[8]  A Ponzi scheme is "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments."[9] "In order to show that an investment scheme falls within the definition of a Ponzi scheme, the Receiver must prove by a preponderance of the evidence the *sine qua non* of a Ponzi scheme: that returns to earlier investors were paid by funds from later investors."[10]

In his motion, the Receiver asserts that during the relevant time period NNU used cash from new investors to pay earlier investors.[11]  He also states that NNU attracted new investors by promising large returns with little to no risk.[12]  By the time the SEC began its enforcement action, NNU owed over $110 million to its investors.[13]  The Turpin Firm does not dispute these facts, so they are established for the purpose of summary judgment.[14]  On this basis, the court finds that NNU was operated as a Ponzi scheme during the period when it made the relevant payments to the Turpin Firm.

## I.     The Turpin Firm's Services

This case involves payments NNU made to the Turpin Firm for its work on two matters. First, NNU paid the Turpin Firm for its work resolving an IRS Statutory Notice of Deficiency

---

[8] *See* Dkt. 32 at 7–11.

[9] *Sender v. Nancy Elizabeth R. Heggland Family Trust (In re Hedged-Inv. Assoc., Inc.)*, 48 F.3d 470, 471 n.2 (10th Cir. 1995) (citation omitted).

[10] *SEC v. Mgmt. Soutions., Inc.*, No. 2:11-cv-1165, 2013 WL 4501088, at *19 (D. Utah Aug. 22, 2013) (citing *Am. Cancer Soc'y v. Cook*, 675 F.3d 524 (5th Cir. 2012)).

[11] Dkt. 32 at 9.

[12] *Id.* at 9–10.

[13] *Id.*

[14] *See* FED. R. CIV. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of the materials in the record . . . ."); DUCiv 56-1(c)(2)(B) ("If a fact is disputed, so state and concisely describe and cite with particularity the evidence on which the non-moving party relies to dispute that fact . . . .").

that was issued to Mr. Palmer and his wife in 2008.  Second, NNU paid the Turpin Firm for services in connection with an IRS audit of NNU in 2011.  The court discusses these two events below.

The Turpin Firm first performed work in response to a 2008 IRS Statutory Notice of Deficiency sent to Mr. Palmer and his wife for tax years 2004, 2005, and 2006.[15]  In December 2008, Mr. Palmer contacted the Turpin Firm for assistance in responding to the Notice.[16]  The Notice was addressed to "Wayne Palmer & C. Negrett-Palmer."[17]  The adjustments disputed in the Notice resulted mainly from the IRS's examination of NNU's books and records.[18] Correspondence between Mr. Palmer and the Turpin Firm appears to reference Mr. Palmer as the client.[19]  The Turpin Firm claims, however, that NNU was also a client because "anytime that you have a pass-through entity, you're going to represent the entity and all of the recipients of the K-1 distributions or pass-through. You're always going to have both."[20]

During the tax years covered by the Notice, NNU was organized as a single-member LLC, with Mr. Palmer as the single member.[21] As a single-member LLC, NNU was disregarded by the IRS for income tax purposes, meaning that "the business activity carried on by the LLC for federal income tax purposes was treated as though it was owned by the member and the

---

[15] Williams Report, Dkt. 31-1 at 4.

[16] *Id.* 31-1 at 4.

[17] Turpin Deposition, Dkt. 33-9 at 34–37; Exhibit 6.

[18] Williams Report, Dkt. 31-1 at 5–7; Dkt. 30 at 8; Dkt. 34 at 6.

[19] *See* Dkt. 32 at 14 n.44; *see, e.g.,* Turpin Deposition, Dkt. 33-9 at 5–7 (noting that the engagement letter was addressed to Mr. Palmer); 53 (noting that the attorney agreement stated that "[t]his Client and Attorney Agreement is entered into between Wayne Palmer ('Client'), and Michelle Turpin & Associates, P.C. (the 'firm')").

[20] Turpin Deposition, Dkt. 33-9 at 24.

[21] *Id.* at 2.

income was reported by the member."[22]  Because NNU was a disregarded entity for income tax purposes, any income tax liability assessed for NNU's activities was a tax liability of Mr. Palmer.[23]  While the IRS could issue a charging order to receive Mr. Palmer's distributions from NNU, the IRS could not directly levy NNU's assets to pay Mr. Palmer's income tax.[24]

During the time the Turpin Firm was providing services related to the Notice of Deficiency, NNU "continued as a viable business entity separate and apart from its member" for all business purposes save for income tax liability.[25]  NNU maintained its books and records in accordance with IRS rules in such a way that "the integrity of the LLC as a separate business entity was maintained and it is unlikely that a creditor of [NNU] could expect to prevail in a court action against [Mr.] Palmer."[26]

The Turpin Firm was ultimately successful in persuading the IRS to concede all the disputed adjustments at issue in the 2008 Notice of Deficiency.[27]  The Receiver does not appear to dispute that the Turpin Firm's services in defending against the Statutory Notice of Deficiency were satisfactory and worth the amount charged.

---

[22] Dkt. 30 at 7 (citing Turpin Depo 50: 4–5); *see also* Dkt. 34 at 5 (responding to the paragraph quoted, stating that "[t]o the extent that facts are being alleged, they are undisputed for purposes of the Motion and this Opposition only"); Dkt. 31-1 at 2.

[23] Dkt. 36 at 15; Dkt. 37-2 at 32 ("[E]ven though it's a disregarded entity it could still have a liability for other types of taxes. It could be withholding taxes other than income taxes. . . .[T]o say they never pay taxes, that's not correct. They do have to pay taxes.").

[24] *See* Williams Report, Dkt. 31-1 at 2–3 (citing IRM 5.1.21.6.3.2) ("This includes protection of [the single member LLC's] assets from IRS levies for federal income taxes owed by the member."); Williams Deposition, Dkt. 37-2 at 24:24-25:15.

[25] Williams Report, Dkt. 31-1 at 2–3.

[26] *Id.* at 2.

[27] Dkt. 34 at 6.

The Turpin Firm next performed work in response to an IRS audit of NNU's 2008 income tax return, which was reported on Form 1120S.[28] While NNU's business activities were conducted in the same manner, its organizational structure had changed since the first time the Turpin Firm provided services.[29] "On or about January 1, 2007, [Mr.] Palmer, as the single member of the LLC, . . . elect[ed] to have the corporation taxed as an S corporation."[30] The IRS corresponded with the Chief Financial Officer for NNU, Victor Wagner, regarding the audit and it appears that Mr. Palmer was not involved in the examination process.[31] The Turpin Firm's work responding to the audit involved only NNU's records and tax return.[32]

In his Complaint, the Receiver asks for recovery of the full $88,135.37 NNU paid to the Turpin Firm, but in his Motion for Summary Judgment he requests judgment only in the amount of $78,135.37.[33] In its Motion for Summary Judgment, however, the Turpin Firm asks for judgment in its favor on the entire $88,135.37.[34] The Parties do not explain this discrepancy in their motions, but Mr. Williams in his expert report notes that "based on the summary of checks . . . the sum of $78,135.37 was paid on the first examination of National Note's books and records and the balance of $10,000.00 was paid on the second audit."[35] During oral argument on these motions the Parties acknowledged that this was the case.

---

[28] Williams Report, Dkt. 31-1 at 7.

[29] *Id.* at 3.

[30] *Id.*

[31] *Id.* at 8.

[32] *Id.*

[33] Dkt. 32 at 24.

[34] Dkt. 30 at 3 (asserting that the Reciever is seeking $88,135.37); Dkt. 30 at 26 ("The Court should grant summary judgment against the Receiver on all claims against Turpin.").

[35] Dkt. 31-1 at 1.

## SUMMARY JUDGMENT STANDARD

The court must grant summary judgment when "the movant shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."[36] In conducting this analysis, the court "view[s] all of the facts in the light most favorable to the non-movant and draw[s] all reasonable inferences from the record in the non-movant's favor."[37] While the court "view[s] the record in the light most favorable to the non-moving party, that party must still identify sufficient evidence requiring submission to the jury to survive summary judgment."[38]

On summary judgment, "[t]he movant bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[39] If the moving party meets this initial burden, "the burden shifts to the nonmovant to . . . set forth specific facts . . . from which a rational trier of fact could find for the nonmovant."[40] Further, when considering cross-motions for summary judgment the court is "entitled to assume that no evidence needs to be considered other than that filed by the parties, but summary judgment is nevertheless inappropriate if disputes remain as to the material facts."[41] And "[c]ross-motions for summary judgment are . . . treated separately; the denial of one does not require the grant of another."[42]

---

[36] FED. R. CIV. P. 56.

[37] *Fischer v. Forestwood Co.*, 525 F.3d 972, 978 (10th Cir. 2008).

[38] *Id.* (internal quotation marks omitted).

[39] *Whitsel v. Sengenberger*, 222 F.3d 861, 867 (10th Cir. 2000).

[40] *Id.* (internal quotation marks omitted).

[41] *Atlantic Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th 2000) (citation omitted).

[42] *See also US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (10th Cir. 2010) (alteration in original) (internal quotation marks omitted).

**ANALYSIS**

As an initial matter, the court grants Defendants' Motion for Summary Judgment in part. First, the court grants the Turpin Firm's Motion for Summary Judgment on the Receiver's Fourth, Fifth, and Sixth Claims for Relief. The Receiver stipulated to the dismissal of these claims in his response to the Turpin Firm's Motion.[43] Second, the court grants Defendants' Motion for Summary Judgment on the $10,000 claim that correlates with the Turpin Firm's work to defend the audit of NNU's 2008 return. As discussed above, the Receiver requests only $78,135.37 in his Motion for Summary Judgment.[44] Further, in his response to the Turpin Firm's Motion for Summary Judgment, the Receiver's arguments are directed only to the work the Firm provided on the Notice of Deficiency, and do not address the significance of NNU's reorganization as an S corporation with income tax liabilities.[45] Because the Receiver did not move for this $10,000 and failed to oppose the Turpin Firm's motion on this basis, Defendants' motion is granted on the $10,000 paid for services provided in relation to the audit of NNU's 2008 tax return.

The court now addresses the remaining claims—the Receiver's First, Second, and Third Claims for Relief as to the $78,135.77 paid to the Turpin Firm for its work in response to the 2008 IRS Statutory Notice of Deficiency. All of these claims arise under the Utah Fraudulent Transfers Act (UFTA). Under the UFTA, fraudulent transfers are avoidable and recoverable by a creditor. "In an action for relief against a transfer . . . under this chapter, a creditor . . . may obtain: (a) avoidance of the transfer . . . to the extent necessary to satisfy the creditor's

---

[43] Dkt. 34 at 2.

[44] *See* Dkt. 32 at 24.

[45] Dkt. 34 at 11 ("The Turpin Firm admits that National Note, as a single-member limited liability company, had no liability for the Palmer's income tax liabilities . . . . The Turpin Firm admits that its services had no impact on National Note's tax liabilities.").

claim[.]"[46] "[T]o the extent a transfer is voidable in an action by a creditor under Subsection 25-6-8(1)(a), the creditor may recover judgment for the value of the asset transferred . . . ."[47]

The Receiver alleges payments NNU made to the Turpin Firm were fraudulent transfers under three alternative provisions of the Utah Code. The Receiver asserts separate claims for relief through avoidance of fraudulent transfers because the debtor (1) had actual intent to defraud under Section 25-6-5(1)(a); (2) did not receive reasonably equivalent value and intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due under Section 25-6-5(1)(b); or (3) did not receive reasonably equivalent value and was insolvent at the time of the transfer under Section 25-6-6(1).

The Turpin Firm argues, first, that the Receiver lacks standing to pursue these claims; second, that the Receiver cannot prove so-called actual fraudulent transfer under the UFTA because he cannot prove intent; and third, that the Receiver cannot prove constructive fraudulent transfer under the UFTA. For the reasons discussed below, the court concludes that the Receiver has standing. The court also concludes that the Receiver can prove both actual and constructive fraudulent transfer. Therefore, the court grants Plaintiff's Motion for Summary Judgement on his First, Second, and Third claims in the amount of $78,135.77. The court addresses these issues in turn.

## I.      The Receiver has Standing

Generally, "the [UFTA] requires a 'creditor-debtor relationship,'" with the plaintiff being the creditor seeking to recover fraudulent transfers made by the debtor.[48] The statute speaks in

---

[46] UTAH CODE § 25-6-8(1)(a).

[47] UTAH CODE § 25-6-9(2).

[48] *Tolle v. Fenley*, 132 P.3d 63, 66 (Utah Ct. App. 2006).

terms of remedies available to the creditor[49] and states that "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor" under certain specified circumstances.[50] When receivers are appointed over entities, they generally have standing to pursue the claims of the entities themselves, not of the entities' creditors.[51] Under these principles the Receiver, who has here stepped into the shoes of NNU, would lack standing under the UFTA to recover fees paid to the Turpin Firm because the Firm and NNU are not in a creditor-debtor relationship.

But the Seventh Circuit announced, and the Tenth Circuit subsequently adopted, an exception to this general rule for companies run as Ponzi schemes. This exception allows receivers to pursue fraudulent transfers made in the course of Ponzi schemes as if the entities in receivership were creditors. This rule was first announced in *Scholes v. Lehmann*.[52] In that case, Judge Posner explained that normally a debtor is not able to recoup fraudulent transfers it has made because "the wrongdoer must not be allowed to profit from his wrong by recovering property that he had parted with in order to thwart his creditors."[53] The court explained, however, that when an owner operates a company as a Ponzi scheme the company is in effect an "evil zombie[]" and when the company is freed from the owner's spell it becomes "entitled to the return of moneys—for the benefit not of [the owner] but of innocent investors—that [the owner] had made the [company] divert to unauthorized purposes."[54] Under this theory, the company has

---

[49] UTAH CODE § 25-6-8.

[50] UTAH CODE § 25-6-5.

[51] *Klein v. Cornelius*, 786 F.3d 1310, 1316 (10th Cir. 2015) (recognizing that "receivers may only sue to redress injuries to the entity in receivership, and not directly on behalf of the entity's creditors").

[52] 56 F.3d 750 (7th Cir. 1995).

[53] *Id.* at 754.

[54] *Id.*

10

standing because, as an independent legal entity, it too was harmed by the owner's fraudulent conveyances.[55]

The Turpin Firm argues that this exception provides receivers standing to pursue only "payments made in furtherance of Ponzi schemes" and that the Receiver lacks standing to pursue the claims here because the payments made to the Firm were not in furtherance of the scheme.[56] The Tenth Circuit has not articulated such a limitation on the Ponzi scheme exception. In *Klein v. Cornelius*, the Tenth Circuit considered whether a company that was run as a Ponzi scheme had standing to pursue transfers that it made to a law firm under the Uniform Fraudulent Transfers Act.[57] In addressing this issue, the court concluded simply that "a business entity abused by a Ponzi scheme qualifies as a defrauded creditor," thus allowing the company to pursue the transfers made to the law firm.[58] The court did not limit standing to allow the receiver to pursue only transfers made "in furtherance of the scheme," but instead employed general language that on its face permits receivers to pursue claims that might be available to a defrauded creditor.[59]

In sum, the court does not read *Cornelius* to impose the limitation urged by the Turpin Firm. Rather, this binding authority appears to provide receivers standing to pursue claims that would otherwise be available to a defrauded creditor. Because NNU was operated as a Ponzi

---

[55] *Id.* at 754–55; *see also Knauer v. Jonathon Roberts Fin. Grp., Inc.*, 348 F.3d 230, 234 (7th Cir. 2003) (explaining that "[a]s long as an entity is legally distinct from the person who diverted the funds from the entity, a receiver for the entity has standing to recover the removed funds").

[56] Dkt. 30 at 17–18.

[57] 786 F.3d 1310, 1313 (10th Cir. 2015).

[58] *Id.* at 1316.

[59] *Id.* at 1316–17.

scheme at the time it made all of the relevant payments, the Receiver has standing to bring

fraudulent transfer claims seeking to recover payments made to the Turpin Firm.

## II.     Actual Fraudulent Transfer

Having concluded that the Receiver has standing, the court addresses the Receiver's First

Claim, his actual fraudulent transfer claim.  Section 25-6-5 of the UFTA states that:

> (1) A transfer made or obligation incurred by a debtor is fraudulent as to a
> creditor, whether the creditor's claim arose before or after the transfer was made
> or the obligation incurred, if the debtor made the transfer or incurred the
> obligation:
>      (a) with actual intent to hinder, delay, or defraud any creditor of the
> debtor; . . .

Section 25-6-9 of the UFTA also provides a good faith defense to this provision, under which "a

transfer is not voidable under Subsection 26-6-5(1)(a) against a person who took in good faith

and for reasonably equivalent value."  The Receiver does not dispute that the Turpin Firm took in

good faith.[60]  Therefore, the court must resolve two questions: (1) whether the Receiver has

shown that NNU made the transfers at issue "with actual intent to hinder, delay, or defraud"; and,

if so, (2) whether the Turpin Firm can show that the transfers were made for "reasonable

equivalent value."

### A. Intent is Properly Inferred Under the Ponzi Presumption

The UFTA sets forth a non-exhaustive list of factors the court may consider to determine

actual intent, including whether "the transfer or obligation was to an insider," whether "the

transfer or obligation was disclosed or concealed," and whether "the transfer was of all or

substantially all of the debtor's assets."[61]  But when a Ponzi scheme is the transferor, courts

---

[60] Dkt. 34 at 10.

[61] UTAH CODE § 25-6-5(2)(a)–(k).

12

presume that the Ponzi scheme made the transfer with the intent to defraud.[62]  This Ponzi presumption is applied because "Ponzi schemes are insolvent by definition."[63]  And "[i]f the 'Ponzi presumption' applies, the Receiver's burden of proving intent to defraud shifts, and the transferee then has the burden of 'establishing a statutory defense from liability.'"[64]

As noted above, there is no dispute here that NNU operated as a Ponzi scheme when it made the payments at issue to the Turpin Firm.  The Firm nevertheless attempts to limit the Ponzi presumption to transfers made both in furtherance of the scheme and made to "Ponzi scheme investors or persons who received referral fees for enticing investors to invest in the Ponzi scheme."[65]  No such limitation exists in binding case law.  While the Turpin Firm points to many cases in the bankruptcy context, as well as cases from other jurisdictions, case law in this jurisdiction uniformly applies the Ponzi presumption to transfers made by the debtor acting as a Ponzi scheme.[66]  The court concludes that the Ponzi presumption is applicable to the transfers made by NNU while it operated as a Ponzi scheme, including those made to the Turpin Firm.

### B. NNU Did Not Receive Reasonable Equivalent Value

Because the Ponzi presumption applies, the court infers that NNU's transfers to the Turpin Firm were made with "actual intent to hinder, delay, or defraud" as required by Section

---

[62] *Cornelius*, 786 F.3d at 1320 ("And because Ponzi schemes are insolvent by definition, we presume that transfers from such entities involve actual intent to defraud."); *see, e.g., Miller v. Wulf*, 84 F. Supp. 3d 1266, 1274 (D. Utah 2015) ("The Receiver's burden of proving actual intent on summary judgment is conclusively established by proving the entities under his control were operated as a Ponzi scheme.").

[63] *Cornelius*, 786 F.3d at 1320.

[64] *SEC v. Mgmt. Solutions., Inc.*, No. 2:11-cv-1165, 2013 WL 4501088, at *6 (D. Utah Aug. 22, 2013) (quoting *Warfield v. Carnie*, No. 3:04-cv-633, 2007 WL 1112591, at *9 (N.D. Tex. Apr. 13, 2007)).

[65] Dkt. 30 at 19.

[66] *See, e.g., Cornelius*, 786 F.3d at 1320 (applying the Ponzi presumption to transfers made for a third party's legal fees); *Klein v. Ravkind & Assocs.*, No. 2:12-cv-00022, 2014 WL 4249882, at *2 (D. Utah Aug. 27, 2014) (same); *Klein v. King & King & Jones*, No. 2:12-cv-00051, 2013 WL 4498831, at *2 (D. Utah Aug. 19, 2013) (same), *aff'd* 571 Fed. App'x 702 (10th Cir. 2014).

25-6-5(1)(a).  The burden now shifts to the Turpin firm to show that the good faith defense applies.[67]  Under Section 25-6-9(1), a transfer that would otherwise be avoidable under Section 25-6-5(1)(a) cannot be voided if the defendant "took in good faith and for a reasonably equivalent value."  "Good faith and reasonably equivalent value are independent components of this affirmative defense, and the burden is upon the Defendant to establish both the element of good faith and the element of value."[68]  Here, the Receiver accepts for purposes of summary judgment that the Turpin Firm took in good faith.[69]  The issue presented is whether the Turpin Firm provided "reasonably equivalent value."

Determining whether the Turpin Firm provided "reasonably equivalent value" under the UFTA requires a two-step analysis.  First, the court must determine if the Turpin Firm provided "value" to NNU.  If the Turpin Firm did in fact provide value, the court must then consider whether this value was "reasonably equivalent."  Because the court concludes that the Turpin Firm did not provide value to NNU, the court need not consider the issue of reasonable equivalence.

The UFTA states that "[v]alue is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied."[70]  When applying the statute, courts have held that "[t]he primary consideration in analyzing the exchange of value for any transfer is the degree to which the transferee's net worth is

---

[67] In addition to the statutory defense discussed in this section, the Turpin Firm also raised Section 25-6-9(7) as an affirmative defense.  However, Section 25-6-9(7) was enacted during the 2015 legislative session with an effective date of May 12, 2015.  *See* Dkt. 32 at 20–22.  "A provision of the Utah Code is not retroactive, unless the provision is expressly declared to be retroactive."  UTAH CODE § 68-3-3.  Because there is no provision expressly declaring it retroactive, the Turpin Firm is unable to invoke Section 25-6-9(7) as a defense in this case.

[68] *Klein v. King & King & Jones*, No. 2:12-cv-00051, 2013 WL 4498831, at *2 (D. Utah Aug. 19, 2013) (citation omitted), *aff'd* 571 Fed. App'x 702 (10th Cir. 2014).

[69] Dkt. 41 at 10.

[70] UTAH CODE § 25-6-4.

preserved."[71]  This is so because "value is to be determined in light of the act's purpose, in order to protect creditors."[72]  The Utah Supreme Court has recognized that under the UFTA "where the debtor . . . receive[s] reasonable equivalent value, the transfer puts one asset beyond the reach of the creditors, but replaces the asset with one of equivalent value, thus avoiding harm to the creditors."[73]  It is the debtor, therefore, who must receive the reasonable equivalent value.[74]  "In other words, the question is not whether Defendants 'gave reasonably equivalent value; it is whether [the debtor] received reasonably equivalent value.'"[75]

Here, the Turpin Firm argues that through its services it preserved the receivership estate because the Firm successfully challenged the "IRS's tax deficiency of over a million dollars."[76]  The Turpin Firm asserts that if it had done nothing in response to the IRS Statutory Notice of Deficiency additional taxes would have been imposed and "Wayne Palmer would have appropriately paid those taxes from the assets of [NNU]."[77]  The Receiver disagrees, arguing that any tax benefit from the Turpin Firm's services flowed only to Mr. Palmer because NNU could not have had any tax liability as a disregarded entity.  He also argues that that the Turpin Firm's assertion that it preserved the receivership estate is speculative.[78]

---

[71] *Cornelius*, 786 F.3d at 1321 (quoting *SEC v. Res. Dev. Int'l*, 487 F.3d 295, 301 (5th Cir. 2007)).

[72] *Res. Dev. Int'l*, 487 F.3d at 30 (citation omitted) (discussing commentary to the Uniform Fraudulent Transfers Act); *see* UNIF. FRAUDULENT TRANSFER ACT § 3 cmt. 2 (1984) ("Consideration having no utility from a creditor's viewpoint does not satisfy the statutory definition.").

[73] *Rupp v. Moffo*, 358 P.3d 1060, 1064 (Utah 2015).

[74] *See Klein v. King & King & Jones, P.C.*, No. 2:12-cv-00051, 2013 WL 4498831 (D. Utah Aug. 19, 2013) (recognizing "that in order to establish reasonable equivalent value under the UFTA it is . . . the debtor[] who must have received the equivalent value").

[75] *Klein v. Cornelius*, No. 2:11-cv-01159, 2013 WL 6008304, at *3 (D. Utah Nov. 13, 2013) (quoting *In re Lucas Dallas, Inc.*, 185 B.R. 801, 807 (B.A.P. 9th Cir. 1995)), *aff'd* 786 F.3d 1310 (10th Cir. 2015).

[76] Dkt. 30 at 22; Dkt. 36 at 12 ("Turpin provided tax and legal services to National Note preserved [sic] the net worth available to creditors by approximately $1,500,000.").

[77] Dkt. 39 at 7.

[78] Dkt. 41 at 14–16.

While the Parties speak broadly in their papers about the benefit NNU received—or did not receive—from the Turpin Firm's services, in the first step of the court's analysis it is not concerned with benefit. While benefit received may be relevant to whether the value was "reasonably equivalent," the court does not reach that issue in this case. In determining whether NNU received "value," the court is necessarily focused on the language of the statute itself,[79] and particularly the term "value" as it is used there. In its motion, the Turpin Firm claims that the "value" it provided NNU was the enormous reduction in potential tax burden. But framing "value" in this way is inconsistent with the UFTA's definition of value as applied to this case.

Value is a defined term in the UFTA. And value is provided under the Act only if "property is transferred or an antecedent debt is secured or satisfied."[80] This narrow definition conforms with the goals of the statute—preservation of funds available to creditors. If the debtor receives property or satisfies an antecedent debt, the assets available to creditors have not been diminished and creditors have not been damaged. Here, the antecedent debt that has been satisfied is the debt that was due to the Turpin Firm for its services, not some speculative amount of tax liability that was never assessed. The Turpin Firm presumably, and rightfully, would have pursued payment of its fees for services even if those services did not result in millions in tax savings.

The issue then is whether NNU's payments to the Turpin Firm were in satisfaction of NNU's antecedent debt. More precisely, the question here is whether NNU would have been

---

[79] *Monarrez v. Utah Dept. of Transp.*, 2016 UT 10, ¶ 11 ("When interpreting a statute, it is axiomatic that this court's primary goal is to give effect to the legislature's intent in light of the purpose that the statute is meant to achieve. And as we have often noted [t]he best evidence of the legislature's intent is the plain language of the statute itself." (internal quotation marks omitted)).

[80] UTAH CODE § 25-6-4(1) ("Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied. However, value does not include an unperformed promise made other than in the ordinary course of the promisor's business to furnish support to the debtor or another person.").

legally obligated to pay for the Turpin Firm's services. If NNU was legally obligated to pay for the Firm's services, then by making this payment it satisfied an antecedent debt that would rightfully have come out of NNU's assets and it would have received value. And if this were so, the court would have to determine whether this value was "reasonably equivalent." But if NNU was not obligated to pay for those services, NNU was not satisfying a debt through this payment, NNU's net worth was not preserved, and NNU did not receive value under the UFTA.

In its motion, the Turpin Firm has not provided the legal standards or facts to support a claim that NNU was legally obligated to pay for its services. The closest the Parties get to this issue is a dispute over who "retained" the Turpin Firm. While the Parties do not explicitly frame their arguments in terms of contract, the necessary implication of their dispute is that the entity that retained the Firm would be the one contractually liable to pay for its services—and would hold the antecedent debt. The court, thus, analyzes the issue of "value" under contract law because that is the legal theory directly implicated by the Parties' arguments. Also, in its briefing, the Turpin Firm does not suggest an alternative legal theory that would make its fees NNU's legally cognizable antecedent debt.[81]

The Receiver points to evidence that the contractual relationship was between the Turpin Firm and Mr. Palmer, not between the Turpin Firm and NNU.[82] The Receiver submits that "[t]he Palmers retained the Turpin Firm to respond to a notice of deficiency issued to the Palmers by

---

[81] At oral argument, the Turpin Firm argued that "antecedent debt" is broader than a contractual obligation and that the Turpin Firm could have sued NNU for its fees under a quantum meruit theory. Because the Turpin Firm did not argue this theory in its motion, the court does not consider it. *See, e.g., United States v. Polatis*, No. 2:10-cr-0364, 2011 WL 1667919 (D. Utah May 3, 2011) ("[C]ourts have repeatedly recognized that failure to raise arguments in the briefing is a legitimate basis for the court to disregard such arguments." (citing *Haynes v. Trane Serv. Agency v. Am. Std., Inc.*, 573 F.3d 947, 959 (10th Cir. 2009)).

[82] Dkt. 32 at 14 (asserting that "National Note did not retain the Turpin Firm").

the Internal Revenue Service," and "National Note did not retain the Turpin Firm."[83] The Receiver directs the court to several exhibits that appear to identify Mr. Palmer as the client of the Turpin Firm, without reference to NNU.[84] In response to the Receiver's assertion that NNU did not retain the Turpin Firm, the Firm cites the following from Ms. Turpin's deposition— "anytime you have a pass-through entity, you're going to represent the entity and all of the recipients of the K-1 distributions or the pass-through. You're always going to have both."[85]

The Turpin Firm has failed to come forward with competent evidence from which a reasonable jury could conclude that the Firm provided NNU "value" as required to establish its good faith defense. The Firm has failed to show that NNU's transfers were in satisfaction of an antecedent debt that NNU owed, and therefore has not proven "value." A bare assertion made by Ms. Turpin well after the commencement of litigation, stating that "you're always going to have both" is not enough to establish that NNU undertook a contractual obligation to pay the Firm's fees.[86]

Also, the Turpin Firm appears to argue that Mr. Palmer and NNU should be considered the same entity for purposes of the payment of its fees.[87] If Mr. Palmer and NNU were the same entity, then the antecedent debt for the Turpin Firm's services likely would be NNU's. But the

---

[83] Dkt. 32 at 14, ¶¶ 2, 4.

[84] Dkt. 32 at 14 n.44 (referencing the following language in various correspondence: in a letter from Turpin addressed to Mr. Palmer—"You [referring to Palmer] have asked us to represent you with regard to any tax related issues;" letter to Receiver signed by Turpin—"our firm represents Wayne and Christy Palmer in relation to an IRS audit that covered multiple years. The audits involved the income and expenses of National Note of Utah and other business entities which flowed through to the personal returns of Wayne and Christy Palmer" and that there was an outstanding balance due "from Wayne and Christy Palmer relating to [their] representation;" a "client and attorney agreement" identifying the "client" as "Wayne Palmer" and making no mention of NNU; and a client information sheet identifying the taxpayer as Wayne Palmer and his spouse as Christy.).

[85] Dkt. 36 at 15.

[86] The court makes no finding on whether it was appropriate for NNU to pay Turpin's fees or whether these payments were ordinary business expenses as this is not the issue before the court.

[87] Dkt. 39 at 3, 6–7; Dkt. 36 at 24–25.

Turpin Firm has failed to show that Mr. Palmer and NNU were the same legal entity. As the Turpin Firm correctly noted, "[f]or federal tax purposes, owners of disregarded entities are treated as conducting the activities of their entities."[88] However, these company actions are considered the actions of the owner only for federal income tax purposes.[89] The Turpin Firm does not cite to any authority stating that payments made by a disregarded entity are treated as being made by the owner for any purpose other than federal income tax. Instead, the Turpin Firm's own expert, Mr. Williams, stated in his report that Mr. Palmer and NNU were separate legal entities and that the debts of Mr. Palmer could not be imputed to NNU during the time period at issue.[90] The court will not on this record disregard corporate form and impute to NNU an antecedent debt that has not been proven to belong to it simply because it was a single-member LLC at the time the debt was incurred.

In sum, the court concludes that the Receiver has shown actual fraudulent transfer under the UFTA, and that the Turpin Firm has failed to show that its statutory good faith defense applies. Because the Receiver has established that the Ponzi presumption applies, the court infers that the debtor made the transfer "with actual intent to hinder delay or defraud any creditor of the debtor."[91] The Turpin Firm has failed to show that it provided NNU "reasonable

---

[88] Jerald David August et al., *Federal Income Taxation of Single Member Entities: "Tax Nothings"*, ST018 SUPPLEMENT ALI-ABA 1, § IV.A.4 (2012).

[89] *See* Martin J. McMahon, *Now You See It, Now You Don't: The Comings and Goings of Disregarded Entities*, 65 TAX LAW. (Number 2) 259, 263 (2012) ("For federal income tax purposes, the formation of a single-member LLC that does not affirmatively elect to be treated as a corporation simply is a nonevent. Even though ownership of the assets transferred to the LLC is effective for state law purposes, all of the assets continue to be owned by the transferor member of the LLC for federal income tax purposes.").

[90] Williams Report, Dkt. 31-1 at 2 ("National Note maintained its books and records in compliance with the record keeping requirements of the internal revenue laws and in a manner that it could prove that it operated in fact as a business entity separate and apart from its owner . . . . As such, the integrity of the LLC as a separate business entity was maintained and it is unlikely that a creditor of National Note could expect to prevail in a court action against Palmer.").

[91] *See* UTAH CODE § 25-6-5.

equivalent value" because it has failed to provide competent evidence from which a reasonable jury could conclude that NNU's transfers were in satisfaction of NNU's antecedent debt. The Receiver prevails on his First Claim for Relief.

## II.  Constructive Fraudulent Transfer

In addition to his First Claim for actual fraud, the Receiver also asserts two constructive fraud claims under the UFTA. In his Second Claim for Relief, the Receiver argues NNU did not receive reasonably equivalent value and intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due under Section 25-6-5(1)(b). In his Third Claim for Relief, the Receiver argues NNU did not receive reasonably equivalent value and was insolvent at the time of the transfer under Section 25-6-6(1). The court analyzes each of these claims below concluding that the Receiver prevails on both.

### A. Second Claim for Relief Under Utah Code Section 25-6-5(1)(b)

Under Section 25-6-5(1)(b),

> [a] transfer made . . . by a debtor is fraudulent as to a creditor whether the creditor's claim arose before or after the transfer was made . . . , if the debtor made the transfer . . . : (b) without receiving a reasonably equivalent value in exchange for the transfer . . . ; and the debtor: . . . (ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Proof that an entity is operating as a Ponzi scheme establishes that the entity "intended to incur, or believed or reasonably should have believed that [it] would incur, debts beyond [its] ability to pay as they became due."[92] Hence, the question again is whether NNU received "reasonable equivalent value for the transfer." In the context of the Receiver's Second Claim, however, "reasonable equivalent value" is an element of the Receiver's affirmative claim, rather than the

---

[92] *Klein v. King & King & Jones*, No. 2:12-cv-00051, 2013 WL 4498831, at *4 (D. Utah Aug. 19, 2013) (alterations in original) (quoting *Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008)), *aff'd* 571 Fed. App'x 702 (10th Cir. 2014).

Turpin Firm's affirmative defense. For this reason, it is the Receiver's burden on this claim to show that NNU did not receive reasonable equivalent value—that NNU did not owe the Turpin Firm an antecedent debt for its services.[93]

As discussed above, the Receiver in his motion asserted that NNU did not retain the Turpin Firm and therefore would have no obligation to pay its fees.[94] The court finds that the evidence submitted by the Receiver is sufficient to meet his burden to make a prima facie showing that NNU did not owe an antecedent debt to the Turpin Firm. Thus, the burden shifts to the Turpin Firm to "set forth specific facts . . . from which a rational trier of fact could find for" the Firm.[95] But the only evidence that the Turpin Firm cites to dispute this assertion is Ms. Turpin's deposition testimony where she stated that "anytime you have a pass-through entity, you're going to represent the entity and all of the recipients of the K-1 distributions or the pass-through. You're always going to have both."[96] As discussed above, even considering Ms. Turpin's statement in the light most favorable to the Firm as the nonmoving party, there is insufficient evidence to create a genuine issue of material fact for the jury. No reasonable jury could conclude based on this evidence that the Turpin Firm and NNU had entered into a contractual relationship, with the necessary meeting of the minds on the material terms of a contract. [97]

---

[93] *See US Airways, Inc. v. O'Donnell*, 627 F.3d 1318, 1324 (10th Cir. 2010) ("Cross motions for summary judgment are . . . treated separately; the denial of one does not require the grant of another." (alteration in original) (internal quotation marks omitted)).

[94] *See supra* §IIB.

[95] *Whitsel v. Sengenberger*, 222 F.3d 861, 867 (10th Cir. 2000).

[96] Dkt. 36 at 14–15.

[97] And this is assuming that Ms. Turpin's testimony was a statement of fact and not a legal conclusion. On its face, it appears to be a legal statement which the court could properly exclude. *See Christiansen v. City of Tulsa*, 332 F.3d 1270, 1283 (10th Cir. 2003) (finding that the district court properly excluded, on summary judgment, expert testimony as a legal conclusion when the expert discussed whether the defendant acted recklessly).

The court concludes that the Receiver has established constructive fraud under Section 25-6-5(1)(b) of the UFTA. The Receiver met its burden of showing that NNU did not owe the Turpin Firm an antecedent debt, and the Turpin Firm has not sufficiently rebutted this showing. Also, because NNU operated as a Ponzi scheme the Receiver has established that the entity intended to incur debts beyond its ability to pay.

### B. Third Claim for Relief Under Utah Code Section 25-6-6(1)

Having concluded that the Receiver prevails on his First and Second Claims for Relief, the court now considers his final claim under Section 25-6-6(1). Under this Section, "[a] transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if: (a) the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . ; and (b) the debtor was insolvent at the time or became insolvent as a result of the transfer . . . ."[98] "A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets at a fair valuation."[99]

As discussed above, the Receiver has established that NNU did not receive reasonably equivalent value for the payments made to the Turpin Firm. Further, there exists no dispute here that the sum of NNU's debts was greater than all of NNU's assets at a fair valuation before the first payment was made to the Turpin Firm. For these reasons, the court concludes that the relevant transfers to the Turpin Firm were fraudulent under Section 25-6-6(1).[100]

---

[98] UTAH CODE § 25-6-6(1).

[99] UTAH CODE § 25-6-3(1).

[100] Defendants raise Utah Code Section 25-6-9(7) as an affirmative defense to a fraudulent transfer under Section 25-6-5(1)(b) and Section 25-6-6(1). However, as previously discussed, Section 25-6-9(7) was enacted during the 2015 legislative session with an effective date of May 12, 2015, is not retroactive, and does not apply to this case.

## CONCLUSION

Plaintiff's Motion for Summary Judgement is GRANTED. Because the Receiver has met his burden to show that the transfers were fraudulent, Plaintiff is entitled to recover the full value of the transfers under Sections 25-6-8(1)(a) and 25-6-9(2)(a). Defendants' Motion for Summary Judgment is GRANTED in part and DENIED in part. The court grants the Turpin Firm's Motion for Summary Judgment on the Receiver's Fourth, Fifth, and Sixth Claims for Relief. The court also grants Defendants' motion on the $10,000 claim that correlates with the Firm's work to defend the audit of NNU's 2008 tax return. The court denies the Firm's motion on the Receiver's First, Second, and Third Claim for Relief.

The court directs the Clerk of Court to close the case.

**SO ORDERED** this 5th day of July, 2016.

BY THE COURT:

_____

ROBERT J. SHELBY
United States District Judge